Filed 2/28/23  P. v. Sinigur CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>     v.<br><br>VLADIMIR SINIGUR,<br><br>       Defendant and Appellant. | C091622<br><br>(Super. Ct. No. 18FE004949) |

Defendant Vladimir Sinigur committed 18 sex offenses against his daughter, N.S., and two sons, I.S. and C.S.  Sixteen of these offenses were committed against N.S., who was six years old when the abuse came to light.  With respect to these crimes, a jury convicted defendant of two counts of sexual intercourse (counts one and three), five counts of oral copulation (counts five, seven, nine, 11, and 13), one count of sexual penetration (count 15), and eight counts of lewd or lascivious conduct with a child under the age of 14 years (counts two, four, six, eight, 10, 12, 14, and 16).  The remaining two crimes, two counts of lewd or lascivious conduct with a child under the age of 14 years

1

(counts 17 and 18), were committed against I.S. and C.S., who were four and seven years old when the abuse came to light. The jury also found defendant committed the foregoing crimes against more than one victim within the meaning of the One Strike law (Pen. Code, § 667.61).[1] Pursuant to this alternate sentencing scheme, the trial court sentenced defendant to an aggregate indeterminate prison term of 250 years to life.

On appeal, defendant contends: (1) the evidence is insufficient to support his convictions for lewd or lascivious conduct with his sons; (2) defendant's convictions for lewd or lascivious conduct with his daughter must also be reversed because they violate section 954; (3) defendant's trial counsel provided constitutionally deficient assistance by failing to object to the admission of his police interview on the ground that defendant neither expressly nor impliedly waived his *Miranda*[2] rights; (4) his trial counsel also provided ineffective assistance by failing to object to the admission of a pretext conversation between defendant and his wife; (5) the trial court prejudicially erred and violated defendant's federal constitutional rights by misinstructing the jury regarding the requirement of unanimity; (6) the cumulative prejudicial effect of the foregoing assertions of error requires reversal; and (7) various sentencing errors occurred, including the claims that (A) all but one multiple-victim "sentence enhancement" must be vacated because the prosecution alleged this "enhancement" with respect to only one count, and (B) the matter must be remanded for a new sentencing hearing because the trial court did not understand that it had the discretion to sentence defendant to concurrent as opposed to consecutive terms of imprisonment.

The Attorney General concedes the latter point. We accept the concession and will therefore vacate defendant's sentence and remand the matter for a new sentencing

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

2

hearing.  We otherwise affirm the judgment.  As we shall explain, the evidence is sufficient to support defendant's convictions for lewd or lascivious conduct with his sons.  We also conclude section 954 was not violated.  Despite the fact that defendant's convictions for lewd or lascivious conduct with N.S. were based on the same acts as his convictions for sexual intercourse, oral copulation, and sexual penetration, the Legislature intended to define separate offenses when it defined the crime of lewd or lascivious conduct and these other more specific sex crimes.  With respect to defendant's first assertion of ineffective assistance of counsel, we conclude the trial court properly determined that he impliedly waived his *Miranda* rights.  We also reject defendant's second assertion of ineffective assistance of counsel.  Defendant's instructional error claim is forfeited and, in any event, also fails.  There being no error, prejudicial or otherwise, there is no cumulative prejudicial impact to assess.  And finally, while we are remanding the matter for resentencing, and therefore need not address certain additional claims of sentencing error advanced by defendant, we do address and reject his assertion that the prosecution was required to plead the multiple-victim allegation as to each count in order for the trial court to impose multiple "enhancements."  The multiple-victim allegation, found true by the jury, is not a sentence enhancement, but rather qualified defendant for sentencing under the One Strike sentencing scheme.

BACKGROUND

*Defendant and N.S. Disclose the Abuse*

In January 2018, defendant and his wife, V.S., shared a room with their three children at defendant's parents' house.  Defendant and V.S. slept on a mattress on the floor.  The children slept on a bunk bed, with N.S. on the top mattress and I.S. and C.S. sharing the larger bottom mattress.  That month, N.S. turned six years old.  I.S. and C.S. were four and seven years old, respectively.

On January 25, while defendant and V.S. were having sex, he asked her when she was "going to let him have [N.S.]"  V.S. thought she misheard him and asked what he

3

meant. Defendant responded, "you know exactly what I mean, you know, have sex with her." V.S. then asked whether he had ever acted on these thoughts. Defendant said he had and admitted having oral, vaginal, and anal sex with his daughter. When V.S. asked defendant how he could do these things, he laughed and acted like she was "making a big deal out of this."

V.S. waited for defendant to fall asleep and then took N.S. into the bathroom for her bath. During the bath, V.S. asked whether defendant had ever done anything to her that she did not like, and whether he had asked her to keep it a secret. N.S. said that defendant "made her suck his tsurka," a Moldovan word for penis.[3] N.S. also said defendant put his penis "between [her] legs" and "he pushed and she told him to stop and . . . he wouldn't stop." N.S. further explained that "stuff like spit would come out" of the end of defendant's penis.

The next day, V.S. called defendant's therapist and told her what defendant and N.S. had said. The therapist informed her that she would have to report the abuse. After V.S. spoke to the therapist, defendant asked her to go for a drive with him. V.S. told defendant she was afraid to go. He promised she would return safely and gave her the car keys so she could drive. They drove to a park, where V.S. asked defendant why he did this to N.S. Defendant said, "he didn't want to do it, [N.S.] wanted it, so that's why he did it." Defendant also said that "he used to think that people who did stuff like this, that that was wrong, but then spirits came to him and told him like why don't you come down to our level and do this kind of stuff and see how you actually feel and he said now I don't feel–I don't think it's wrong anymore."

---

**3**      Defendant and V.S. were immigrants from Moldova. Hereafter, we shall use the word "penis." During N.S's forensic interview, described in greater detail *post*, N.S. also used a Moldovan word for vagina. We shall use the word "vagina" throughout this opinion.

*Initial Investigation*

When defendant and V.S. returned home after their drive to the park, four police cars were parked at the house and several officers were inside. One of the officers had already spoken briefly to N.S., but she did not initially disclose any sexual abuse. However, the officer asked whether defendant "was being mean" to N.S., to which she responded that defendant "hurts us a lot" with a belt and also "talks mad to us and takes away toys." Another officer briefly spoke with I.S. and C.S. The boys confirmed that defendant would get "really mad" and spank them, but both denied that he ever touched their private parts. The officers were conferring about their conversations with the children when defendant and V.S. arrived at the house.

V.S. entered the house and immediately took her children into their bedroom. Defendant also entered the house, without acknowledging the presence of the officers. One of the officers asked to speak with him outside. Defendant "seemed frustrated" but agreed to do so. The officer asked whether he had "done anything illegal with [his] children," to which defendant answered: "By my law, no." When the officer said he was talking about California law, defendant told the officer: "Be specific with me. What are you asking me?" Defendant was then asked whether he sexually abused the children. He denied the allegation. Defendant later said: "I have my kids. And I have my relationship with each one of them the way I want to have the relationship with them. And they have the relationship with me the way they want to have it with me. Simple." He was taken into custody a short time later after he "abruptly ended" the conversation and tried to reenter the house.

N.S. was then interviewed a second time inside the house. During this interview, when the officer asked whether there was anything else defendant did to her, N.S. said: "He wants me to suck him, [penis]." When asked how often that happened, she answered: "A lot." N.S. said this had been happening since she was four years old. She also said it happened on a daily basis. N.S. initially said defendant did not do anything

5

else, but then said she remembered that he also put his penis between her legs and "pushes it." This happened "just two times" and began when she was five years old. N.S. said defendant would give her candy afterwards. N.S. also repeated her description of "spittle" coming out of defendant's penis. She further explained that defendant told her: "If [you] tell anyone, . . . I won't like you anymore."

*Subsequent SAFE Interviews*

The following month, each child was interviewed by a forensic interview specialist at the Special Assault Forensic Evaluation (SAFE) Center.[4]

During N.S.'s interview, she repeated her allegation that defendant "wanted [her] to suck his [penis] and stuff every day" and also gave her candy after she did so. While she said this happened "twenty times," she specifically described four such incidents. Asked about the last time defendant did this, N.S. explained that he called for her to come into the bedroom while everyone else was playing games outside of the room. When she got into the room, defendant told her to lock the door. He then lay down on the bed without pants or underwear on, made her orally copulate him, and gave her candy afterwards. N.S. also described ejaculation, much like she did in her previous statements, and said that defendant told her: " 'Don't tell anyone about this "kay." ' " This incident corresponds to count five (oral copulation) and count six (lewd or lascivious conduct).

N.S. then described a different incident that occurred on her birthday, the details of which were almost identical to the incident described *ante*. This incident corresponds to count seven (oral copulation) and count eight (lewd or lascivious conduct).

---

**4**     The children's trial testimony confirmed much of what they said during their SAFE interviews, but also conflicted in various ways. Where relevant to the issues raised on appeal, we describe their trial testimony during the discussion portion of the opinion. For present purposes, we simply note the children appeared reluctant to testify against their father at trial.

6

A third incident of oral copulation occurred on N.S.'s bunk bed at night. As N.S. described, her mother and brothers were watching something on V.S.'s computer on the mattress on the floor when defendant climbed up onto N.S.'s bed with her and told her to "suck his [penis]" or he would not give her any candy. While she was doing so, one of her brothers asked, "Where is daddy?" Defendant responded: "I'm up here. Come on boys go to sleep or I'll slap you." This incident corresponds to count nine (oral copulation) and count 10 (lewd or lascivious conduct).

The fourth incident of oral copulation also involved penetration of N.S.'s vagina with defendant's finger. N.S. and defendant were alone in the room when defendant first had her orally copulate him and then put coconut oil on his finger and put it inside her vagina. N.S. said, "it really hurt[]," so defendant stopped and let her leave the room. This incident corresponds to count 11 (oral copulation), count 15 (sexual penetration), and counts 12 and 16 (lewd or lascivious conduct).

N.S. also described a different incident in which defendant "tickled" her vagina with his tongue and then held her hands and feet down while he penetrated her vagina with his penis. N.S. said, "it really hurt" when he did so, but this time defendant did not stop. This incident corresponds to count 13 (oral copulation) and count 14 (lewd or lascivious conduct), as well as either count one or count three (sexual intercourse) and either count two or count four (lewd or lascivious conduct).[5]

I.S. and C.S. were also interviewed at the SAFE Center. We need not describe their interviews in any detail. It will suffice to note that each boy described physical abuse in the form of beatings, some of which drew blood. More importantly for our

---

[5]     The other sexual intercourse and lewd or lascivious conduct counts were supported by N.S.'s previous statement that defendant put his penis between her legs and pushed on two occasions, and defendant's admission that he had sexual intercourse with his daughter at least three times, specifically recalling one other act of sexual intercourse that occurred at a park. We describe these admissions in greater detail, *post*.

purposes, they also described separate incidents in which defendant "tickled" their penises. The latter incidents correspond to counts 17 and 18 (lewd or lascivious conduct).

*Defendant's Conversation with V.S. at the Jail*

The day after the SAFE interviews were conducted, V.S. spoke with defendant at the jail at the request of Detective Lindsey Lamb. The conversation was recorded. During the conversation, when V.S. accused defendant of raping N.S., defendant responded: "You're using words that [are] confusing 'cause that's not true.' " V.S. pushed back: "And what words should I be using? You made love to her?" Defendant answered: "Mm-hm." When V.S. repeated the question, in apparent disbelief, defendant responded that it was "none of [her] concern." Defendant gave the same response later in the conversation when V.S. asked him how many times he did this to her, adding: "Nothing that happened between me and any woman is . . . your concern." V.S. then asked: "Okay, did you do anything to the boy?" Defendant responded: "You can push me and you can find out things that you wanna find out but the consequences of that information on you, you're not gonna like it." When V.S. reminded defendant of their previous conversation, specifically that he told her that he "used to think . . . that doing this kind of stuff to kids . . . was not good," but then changed his mind, defendant responded: "I never did anything to kids." V.S. again pushed back: "So [N.S.'s] an adult?" Defendant responded: "Again, that is not your concern."

*Defendant's Interview with Detective Lamb*

Five days later, defendant was interviewed by Detective Lamb. Defendant claimed he viewed the ages of his children differently than their legal ages, explaining: "By my counting [C.S.] is, uh, 16, 17. [N.S.] is, uh, 14 and a half, and [I.S.] is, um, 12 and a half [to] 13." When asked whether N.S. orally copulated him, defendant answered: "Yes, she did." Defendant said it happened twice, claiming that it started when N.S. told him " 'I can't wait until I can have you.' " According to defendant, he was "really

8

against all that stuff" at the time, so he told her it would never happen.  Then "spirits entered [him] and her and confused [him] and things started happening."  When the detective asked what else happened, defendant admitted having oral, vaginal, and anal sex with his daughter.  When asked how many times, defendant answered:  "Three times maybe, four times, I'm not really sure, five times.  I can't count."  Defendant claimed these sex acts with his daughter were consensual.  He also said that in addition to sex acts that occurred at the house, he had sexual intercourse with N.S. on one occasion at a park.  Defendant also admitted giving N.S. candy after various sex acts, but claimed he did not "remember that being a reason" she engaged in these acts with him.  Defendant also confirmed N.S.'s account of him using coconut oil as a lubricant.  Defendant further confirmed placing his tongue on N.S.'s vagina on one occasion.

Detective Lamb also asked defendant whether anything happened between him and his sons.  Defendant answered:  "The only thing is I think I might have taught them how to, uh, how to play with their penis."  Asked how he did so, defendant explained:  "Just how it went.  How to jac–how to ejaculate but they never ended up doing it.  So I just taught them how to play with it, make it go hard pretty much."  When the detective asked what he "explained to them," defendant answered:  "I didn't explain nothing.  I just did it for them once that's all."  Detective Lamb asked whether defendant used his hand.  Defendant said he did.  The detective then asked:  "And what did you do?"  Defendant responded:  "Just play with it."  Further clarifying, the detective asked:  "So you showed [C.S.] and [I.S.] how to do that using your own hand on their penis?"  Defendant answered:  "Just how to get their penis obvious."  Defendant admitted doing this on one occasion for each of his sons.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support his convictions for lewd or lascivious conduct with his two sons.  We disagree.

The standard of review is well-settled:  "When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." '  [Citations.]  Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt.  [Citation.]"  (*People v. Banks* (2015) 61 Cal.4th 788, 804.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict.  [Citation.]"  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

The crime of lewd or lascivious conduct requires proof of the following: (1) willful commission of "any lewd or lascivious act"; (2) "upon or with the body, or any part or member thereof, of a child who is under the age of 14 years"; (3) "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [the defendant] or the child" (§ 288, subd. (a)).  " '*Any* touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim.' [Citation.]  By focusing on the defendant's intent to sexually exploit a child rather than on the nature of the defendant's offending act, section 288 'assumes that young victims suffer profound harm whenever they are perceived and used as objects of sexual desire.' [Citation.]"  (*People v. Shockley* (2013) 58 Cal.4th 400, 404.)

Defendant first challenges the sufficiency of the evidence establishing that he "touched the boys at all." We conclude the evidence is more than sufficient to prove this element of the offense. Both boys stated in their SAFE interviews that defendant tickled their penises. They confirmed this happened during their trial testimony. Defendant also admitted touching the boys' penises during his interview with Detective Lamb, explaining that he "taught them how to, uh, how to play with their penis" in order to "make it go hard pretty much." He added that the point was to "ejaculate," but said they were not able to do so. When asked how he taught them this, defendant admitted he "did it for them once" using his hand. When asked what he did, defendant responded: "Just play with it." Then, when the detective clarified that defendant "showed [the boys] how to do that using [defendant's] own hand on their penis," he did not dispute this description of what happened. Instead, defendant added: "Just how to get their penis obvious."

Defendant argues he might have been talking about teaching the boys how to masturbate by touching his own penis. We acknowledge that defendant did not explicitly confirm the detective's characterization of him touching the boys' penises with his hand. However, as mentioned, nor did he dispute it. More importantly, the boys themselves confirmed that defendant touched their penises, although they thought he was just tickling them. Viewing the evidence as a whole, as we must, a reasonable jury could have concluded beyond a reasonable doubt that defendant touched each boy's penis in order to show them how to masturbate, which each boy interpreted as him tickling their penises.

Defendant's argument that he and the boys were talking about different touchings because the "tickling episodes don't match [defendant's] statements to the detectives about demonstrating masturbation for the boys" is unconvincing. It is not surprising that the boys interpreted defendant's conduct as tickling. In fact, defendant used the words, "[j]ust play with it" to describe how he touched the boys' penises during his interview

with Detective Lamb.  We conclude a reasonable jury could have concluded defendant and his sons were talking about the same conduct.

Defendant also challenges the sufficiency of the evidence establishing he possessed the requisite sexual intent.  In making this argument, he focuses solely on the boys' descriptions of him tickling their penises and asserts nothing in those descriptions supports a conclusion that it was anything other than a "non-sexual tickling."  However, the fact that the boys did not perceive anything sexual about the touchings does not end the inquiry.  It is defendant's intent that matters, not how the touchings were perceived by the victims.  As we have already explained, a reasonable jury could have concluded defendant and the boys were talking about the same touchings, and defendant himself admitted the sexual nature of those touchings.  He "play[ed]" with the boys' penises with the intent to "make [them] go hard" and possibly "ejaculate."  We have no difficulty concluding this satisfies the sexual intent requirement of section 288, subdivision (a).

Finally, in addition to the evidence delineating defendant's conduct with the boys and his admitted intent to sexually stimulate their penises, the jury also heard all of the evidence relating to defendant's conduct with his daughter.  This evidence of defendant's sexual deviancy strongly supported a conclusion that defendant also possessed a sexual intent when touching his sons' penises.

Defendant's convictions in counts 17 and 18 are supported by substantial evidence, as is the finding that defendant committed crimes against more than one victim within the meaning of the One Strike law.

II

*Section 954*

Defendant also claims his convictions for lewd or lascivious conduct with his daughter must be reversed because they violate section 954.  Specifically, he argues these convictions were based on the same acts as his convictions for other sex crimes, i.e., sexual intercourse, oral copulation, and sexual penetration, and the Legislature did not

12

intend to define separate offenses when it defined the crime of lewd or lascivious conduct and these other more specific sex offenses.  He is mistaken.

Section 954 provides in relevant part:  "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . .  The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged . . . ."

Our Supreme Court has "repeatedly held that the same act can support multiple charges and multiple convictions.  'Unless one offense is necessarily included in the other [citation], multiple convictions can be based upon a single criminal act or an indivisible course of criminal conduct (§ 954).'  [Citation.]  Section 954 thus concerns the propriety of multiple convictions, not multiple punishments, which are governed by section 654." (*People v. Gonzalez* (2014) 60 Cal.4th 533, 536-537 (*Gonzalez*).)

For example, in *Gonzalez*, the court held section 954 was not violated where the defendant was convicted of both oral copulation of an intoxicated person and oral copulation of an unconscious person based on the same act of oral copulation.  (*Gonzalez, supra*, 60 Cal.4th at p. 535.)  The court first explained that whether these were separate offenses or rather "different ways of committing the same offense properly turns on the Legislature's intent in enacting [former § 288a, subdivisions (f) and (i)]."  (*Gonzalez,* at p. 537.)  The court then analyzed the statutory language and explained that the conduct defined to be criminal in each subdivision was not necessarily included in the other because "an act of oral copulation may be committed with a person who is unconscious but not intoxicated, and also with a person who is intoxicated but not unconscious."  (*Id.* at p. 539.)  The court further explained that each subdivision of former section 288a "sets forth all the elements of a crime, and each prescribes a specific punishment."  (*Gonzalez* at p. 539.)  The court concluded:  "That each subdivision of [former] section 288a was

13

drafted to be self-contained supports the view that each describes an independent offense, and therefore section 954 is no impediment to a defendant's conviction under more than one such subdivision for a single act." (*Ibid*.)

Here, defendant was convicted of two counts of sexual intercourse (counts one and three) and two counts of lewd or lascivious conduct (counts two and four) based on the same two acts. Defendant was also convicted of five counts of oral copulation (counts five, seven, nine, 11, and 13) and five counts of lewd or lascivious conduct (counts six, eight, 10, 12, and 14) based on the same acts. Finally, his convictions for sexual penetration (count 15) and lewd or lascivious conduct (count 16) were also based on the same act. Thus, we must determine whether the Legislature intended to define a separate offense when it enacted section 288, defining the crime of lewd or lascivious conduct, or rather intended this section to merely be a different way of committing the crimes of sexual intercourse, oral copulation, or sexual penetration of a child, defined in section 288.7.

The answer can be found in the language of section 288, subdivision (a), which states in relevant part, "a person who willfully and lewdly commits any lewd or lascivious act, *including any of the acts constituting other crimes* provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years." (Italics added.) The statute specifically states that the commission of "other crimes" may also constitute the crime of lewd or lascivious conduct. (§ 288, subd. (a).)

Section 288.7 defines such other crimes: "(a) Any person 18 years of age or older who engages in sexual intercourse or sodomy with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 25 years to life. [¶] (b) Any person 18 years of age or older who engages in

14

oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life."

The crimes defined by sections 288 and 288.7 are not necessarily included within each other because an act of sexual intercourse, oral copulation, or sexual penetration with a child who is 10 years of age or younger may be committed without the specific intent required by section 288,[6] and conversely, a lewd or lascivious act need not be any of the specific acts set forth in section 288.7, but may be a seemingly innocuous touching if accompanied by the requisite intent. Moreover, as in *Gonzalez*, each subdivision at issue here (§ 288, subd. (a), § 288.7, subd. (a), and § 288.7, subd. (b)) "sets forth all the elements of a crime, and each prescribes a specific punishment." (*Gonzalez, supra*, 60 Cal.4th at p. 539.) The crime of lewd or lascivious conduct is also defined in a separate section, as opposed to a separate subdivision of the same section, providing further support for our conclusion that it is a "self-contained" offense. (*Ibid*.)

In sum, the crime of lewd or lascivious conduct is an independent offense because: (1) it is set forth in an entirely different statute, section 288, subdivision (a), than the

---

**6** The crimes of sexual intercourse and oral copulation set forth in section 288.7 do not require any specific intent at all. (See *People v. Saavedra* (2018) 24 Cal.App.5th 605, 613 (*Saavedra*) [oral copulation in violation of § 288.7, subdivision (b) is a general intent crime].) The crime of sexual penetration does require a specific intent. This is because it incorporates the definition of "sexual penetration" set forth in section 289, subdivision (k)(1) of which requires the sexual penetration to have been "for the purpose of sexual arousal, gratification, *or abuse* . . . ." (§ 289, subd. (k)(1), italics added; see also *Saavedra,* at p. 613.) Thus, while lewd or lascivious conduct in violation of section 288, subdivision (a) requires a specific intent "of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [the defendant] person or the child" (§ 288, subd. (a)), sexual penetration in violation of section 288.7, subdivision (b) can be violated with an abusive rather than an arousing or gratifying intent. (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1538 ["the crime of unlawful sexual penetration requires the specific intent to gain sexual arousal or gratification *or to inflict abuse on the victim*," italics added].)

15

other crimes set forth in section 288.7, subdivisions (a) and (b); (2) different mental states are required; (3) lewd or lascivious conduct covers a broader range of conduct, with different age thresholds, than the other more specific sex offenses; (4) the different statutes prescribe different punishments; and (5) section 288, subdivision (a) specifically states that the commission of "other crimes" may also constitute the crime of lewd or lascivious conduct.  (§ 288, subd. (a).)

For the foregoing reasons, we conclude section 954 does not prohibit multiple convictions for lewd or lascivious conduct in violation of section 288, subdivision (a) and the other crimes set forth in section 288.7, subdivisions (a) and (b) based on the same physical act.  However, while section 954 does not provide defendant with any relief, section 654 does, and that is precisely what the trial court applied.

### III

### Miranda *Waiver*

Defendant further asserts his trial counsel provided constitutionally deficient assistance by failing to object to the admission of his police interview on the ground that Detective Lamb did not obtain a valid waiver of his *Miranda* rights.  We address and reject the core of this assertion outside the rubric of ineffective assistance of counsel.  As we explain, the trial court properly determined that defendant impliedly waived his *Miranda* rights.

A. *Additional Background*

At the start of Detective Lamb's interview with defendant, she fully and accurately advised him of his *Miranda* rights.  Before doing so, she also told defendant "when I've read you your rights if you don't understand them or have any questions about 'em just let me know and I'll clarify, okay?"  After the *Miranda* advisement, defendant did not indicate a lack of understanding and did not ask for clarification.  Detective Lamb then informed defendant that she was there to speak to him "about a case involving your daughter" and asked whether he knew "what that's regarding."  Defendant answered:

16

"Yes, I've been informed." The interview continued from there. We have already provided a summary of defendant's admissions during the interview. For present purposes, we add that defendant's first language was Moldovan, but he spoke fluent English and stated that he studied English in school when he moved to the United States in 2007. Defendant also appeared to be coherent during the interview, seemed to fully understand the detective's questions, and also seemed quite intelligent, notwithstanding some admittedly delusional thinking.

We provide one example of the latter to place the arguments made before the trial court in their proper context. When asked about his relationship with N.S., defendant explained that a "group of people" approached him at some point in the past, during his "spiritual growth," and told him that he was "very delicious and they wanted to eat [him]." Defendant continued: "I couldn't say no. I–for some reason the law in me was used somehow used to take that away from me. And I said, yes, but they cut my body apart. They ate it all. And after that there was again a spiritual rule but by myself then. There was nobody there. But I had the power that nobody else had, you know, I was able to torment people. So–and when I found the person that was responsible for that and I tormented them until they build me another body." Defendant continued in a similar manner until redirected to a specific question about the allegations of sexual abuse. He answered that question, and follow-up questions, clearly and concisely.

Defendant filed an in limine motion seeking to, among other things, exclude his police interview "pursuant to *Miranda* . . . and its progeny." The motion itself did not specify the reason *Miranda* was claimed to have been violated. The prosecution, however, filed a more comprehensive opposition to the motion, arguing Detective Lamb properly advised defendant of his *Miranda* rights and defendant validly waived those rights by talking to her about the case.

At the hearing on the motion, the trial court indicated that it had listened to the interview in its entirety and then heard from defendant's counsel. Counsel cited records

17

from a psychiatric appointment defendant had about a month before his interview with Detective Lamb. Counsel described the records as indicating that defendant had a previous diagnosis of bipolar disorder, presented with "confusing cognitive functioning" and thinking that was both "delusional and . . . paranoid," and "he would be further assessed for psychosis." Counsel also noted defendant "had not been taking psychotropic medications for two months" prior to the appointment, "believed that people on the TV and on the radio [were] talking to him," among other delusional thoughts, and also had a chemical imbalance. Counsel then noted defendant returned for a second psychiatric visit two days later, during which V.S. said defendant "had not been sleeping" and was "saying things that do not make any sense at all as if he was speaking to a computer." The person who saw defendant noted that he "exhibited delusional thought content."

Defense counsel argued these psychiatric symptoms precluded defendant's waiver of his *Miranda* rights from being "knowing and intelligent": "When there are symptoms such as these, paranoia, delusion, psychosis, bipolar disorder, not taking prescribed medication that he was given for his pre-existing diagnosis, he is deluded to the point that he believes there is metal in his body, that people on the television and radio are speaking to him. He is himself seen talking to a computer by his wife and that the computers are actually talking to him. That is not the behavior of someone who could understand and knowingly waive *Miranda* warnings." Counsel also correctly informed the trial court that the standard for assessing whether defendant knowingly and intelligently waived his *Miranda* rights was "to simply look to the totality of the circumstances."[7]

In response, the prosecutor noted the second of these psychiatric visits was on the same day the police showed up at the house and spoke to defendant about the allegations

---

[7]    Defense counsel specifically disclaimed any argument "that Detective Lamb's *Miranda* warnings were defective in any way or there was any police coercion or that the statement that [defendant] gave to Detective Lamb was involuntary."

of abuse. The prosecutor argued that despite "these diagnoses and these behaviors that he was exhibiting," he was nevertheless "able to answer questions that are being posed to him" by the officers and "able to make denials when he feels that he is being accused of something he did not do." The prosecutor also noted that defendant decided to end that interview and try to reenter the house. The prosecutor then discussed a case from the United States Supreme Court, *Colorado v. Connelly* (1986) 479 U.S. 157, 170 [93 L.Ed.2d 473], in which a delusional defendant felt compelled by "the 'voice of God' " to confess to a murder and the high court held the defendant's waiver of his *Miranda* rights was not thereby rendered involuntary. (*Id.* at p. 170.)

Finally, the prosecutor turned to the interview with Detective Lamb, noting it occurred "a month later," and arguing: "[Defendant] is able to correct the detective during the interview. He is able to correct the detective about her grammar. He is able to talk about two different worlds he lives in, as he expresses it, but he can track both sides." As an example of these two worlds, the prosecutor cited defendant's statements to the detective indicating that he viewed his children's ages differently than their actual ages. As stated previously, defendant stated that he viewed N.S.'s age as being 14 and a half. However, as the prosecutor noted, he appeared to understand that his "calculations" were not the same as "the rest of the world." Indeed, he agreed with the detective when she clarified that the children were four, six, and seven years old, as she put it, "[i]n my–my terms." The prosecutor argued, "there are multiple examples, which is why we wanted the Court to review the audio in its entirety, because there are multiple examples of that description that the defendant will use where he will say, in my world it's this, but in your world, it's this." The prosecutor then noted the detective often asked defendant questions to make sure he had "situational awareness." The prosecutor argued, "defendant understood what conversation he was having and who he was having it with, and if the defendant was able to understand that, then I think it would logically follow

19

. . . that [he] understood what he was doing when he waived his *Miranda* rights and proceeded to talk to the officer and engage in the interview . . . ."

Defense counsel responded that the prosecutor's description of defendant differentiating "between his world, his calculation of time and Detective Lamb's world and her calculation of time is clear evidence of either psychosis or delusion."

The trial court issued an extensive and thoughtful ruling from the bench. The court ultimately concluded that defendant both "understood and properly waived his [*Miranda* rights]" and also "made a knowing, intelligent, and voluntary statement to law enforcement." This conclusion was based on the court's review of the entire interview, as well as "all of the mental health records," including "jail psychiatric records" that indicated defendant "was thinking and acting rather rationally" closer to the time of the actual interview, and the fact that defendant was "not a stranger to the criminal justice system."

 B. *Analysis*

As a preliminary matter, we note that defendant's assertion on appeal is one of ineffective assistance of counsel. He claims his trial counsel provided constitutionally deficient assistance by not objecting to the admission of his interview with Detective Lamb on the specific ground that Lamb did not obtain a valid waiver of his *Miranda* rights, but rather "plow[ed] directly into the interrogation, without stopping to ask whether he understood his rights." However, there being no explicit waiver in this case, the parties appeared to have assumed that an implied waiver would be found if it could be "clearly inferred from [defendant's] actions and words," after being properly advised of his *Miranda* rights, that he "knowingly and voluntarily waived [those] rights" by speaking to the detective. (*North Carolina v. Butler* (1979) 441 U.S. 369, 373 [60 L.Ed.2d 286] (*Butler*).) Defense counsel specifically argued defendant's psychiatric condition prevented any such waiver from being knowing and intelligent. The trial court disagreed and found a knowing waiver of these rights based on the totality of

20

circumstances surrounding the interrogation. To be sure, defense counsel did not specifically argue the detective's "*Miranda* procedure" of moving directly from advisement to questioning rendered any subsequent implied waiver invalid, but that procedure was part of the totality of the circumstances the trial court considered in making its ruling. We conclude defense counsel's objection preserved the claim raised on appeal and will therefore address the claim outside the rubric of ineffective assistance of counsel.

"The rule the [United States Supreme] Court established in *Miranda* is clear. In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation." (*Fare v. Michael C.* (1979) 442 U.S. 707, 717 [61 L.Ed.2d 197].) "*Miranda* further recognized that after the required warnings are given the accused, '[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' [Citation.]" (*Id*. at p. 724.) "[A] valid waiver of *Miranda* rights may be express or implied." (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218 (*Sauceda-Contreras*).)

Here, there is no dispute that Detective Lamb accurately delivered the required warnings. Nor is there any claim that defendant expressly waived his *Miranda* rights. The question we must resolve, whether defendant impliedly waived those rights, "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." (*Butler, supra*, 441 U.S. at p. 373.) As the high court has made clear, while "courts must presume that a defendant did not waive his rights[,] . . . in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." (*Ibid*.) This question "must be determined on 'the

particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.' [Citations.]" (*Id*. at pp. 374-375.)

As our Supreme Court has summarized: "Although there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation." (*People v. Cruz* (2008) 44 Cal.4th 636, 668 (*Cruz*).) Moreover, "[a]lthough we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we ' "give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.' [Citations.]" (*People v. Wash* (1993) 6 Cal.4th 215, 236.) The knowing and voluntary nature of such a waiver need only be established by a preponderance of the evidence. (*Ibid*.)

Defendant argues this standard is not met in this case because he did not tell Detective Lamb that he understood each of his *Miranda* rights and knowingly and voluntarily waived them. Defendant also argues two additional circumstances prevented any implied waiver of his *Miranda* rights from being knowing and intelligent; his mental illness and the fact that English was not his first language. We are not persuaded.

First, defendant was not required to specifically tell the detective that he waived his rights. It is conceded that no express waiver occurred. We are determining whether an implied waiver occurred based on the totality of the circumstances.

Second, defendant's argument that the "transcript is replete with instances in which he didn't understand what the detectives were asking him, and in which he gave responses that were either delusional or included words that didn't make sense in the context of the sentences," is belied by the record. Having reviewed the transcript *and listened to the audio of the interview*, we are confident that there was no language barrier between Detective Lamb and defendant during the interview. As the trial court observed, defendant "speaks very, very good English." Indeed, on one occasion, he corrected the

22

detective's grammar. Moreover, as the trial court also observed, Detective Lamb specifically asked defendant "no problems understanding what we're talking about here?" She then told him to ask her to clarify if there was anything he did not understand. He did not indicate there was any lack of understanding. And when defendant did not understand a question later in the interview, he followed the detective's instruction and asked for clarification. For example, when asked about N.S.'s allegations of child molestation, defendant said, "child molestation I'm not sure what that is." The detective responded, "in this case it would be oral copulation, meaning that she sucked your penis." Defendant admitted: "Yes, she did."

We do acknowledge the seemingly delusional nature of some of defendant's responses. However, just as delusions do not necessarily render a waiver of *Miranda* rights involuntary (*Colorado v. Connelly, supra*, 479 U.S. 157, 170), nor do they necessarily render such a waiver unknowing. We must view defendant's odd statements in the context of the entire interrogation.

Defendant's first strange statement about his children's ages was followed by the detective asking him whether he had any medical issues. Defendant answered that his body was "jumped" prior to his birth and implanted with metal. In response, the detective asked defendant a series of questions to make sure he knew where he was located in time and space, as well as the identity of the President of the United States. Defendant answered these questions correctly. Although defendant said the year was 2028 by his "counting," he knew the year was actually 2018. Defendant also acknowledged he previously went to a psychiatric facility after he threatened to harm his children. Defendant then answered a series of questions about his life and living situation. Only then did the interview shift to allegations of sexual abuse. It was at this point that defendant asked the detective to clarify the meaning of "child molestation" and admitted that N.S. orally copulated him. We have already described defendant's further admissions, including his apparent belief that N.S. initiated their first sexual contact, that

23

"spirits entered [him] and her and confused [him]," and that defendant ultimately engaged in oral, vaginal, and anal sex with his daughter between three and five times. Additional details need not be recounted here. It will suffice to note that notwithstanding defendant's strange beliefs, our review of the entire recorded interview reveals he understood the detective's questions and provided direct and coherent answers to her specific questions regarding the abuse.

Turning to the crux of defendant's appellate contention, we acknowledge the fact that defendant did not state that he understood his rights is a relevant circumstance. (See, e.g., *Sauceda-Contreras, supra*, 55 Cal.4th at p. 206; *Cruz, supra*, 44 Cal.4th at p. 666; *People v. Whitson* (1998) 17 Cal.4th 229, 245.) We disagree, however, with his assertion that this circumstance is "a bridge too far under *Miranda* and *Butler*." To be sure, in *Butler, supra*, 441 U.S. 369, the suspect was asked whether he understood his rights and replied that he did. (*Id*. at pp. 370-371.) Similarly, in *Sauceda-Contreras, supra*, 55 Cal.4th 203, the defendant "clearly indicated that he understood each of those rights." (*Id*. at p. 206.) In *Cruz, supra*, 44 Cal.4th 636, after the defendant answered, " 'more or less' " when asked whether he understood his *Miranda* rights, the detective repeated each of the rights, and the defendant "indicated after each one that he understood." (*Id*. at p. 666; see also *Whitson,* at p. 245 [the "defendant affirmatively told the interviewing officers that he understood those rights"]; *People v. Sully* (1991) 53 Cal.3d 1195, 1233 ["Asked if he understood his rights, defendant, a former police officer, responded, 'Yes, I do.' "].) However, in none of these cases did the court hold an affirmative expression of understanding is required. It is simply one circumstance to be considered among the totality of the circumstances surrounding the interrogation.

In this regard, *In re Eduardo G.* (1980) 108 Cal.App.3d 745 (*Eduardo G.*) is instructive. There, concurrent with the minor's adjudication hearing, the juvenile court heard and denied the minor's *Miranda* motion seeking to suppress statements he made to police officers during a traffic stop. (*Id*. at p. 750.) The officers had reason to believe the

24

minor was driving a stolen car. One of the officers advised the minor of his *Miranda* rights and asked whether he gave up these rights. The minor answered in the affirmative. He was then asked whether the car was stolen, and the minor admitted to stealing the car. (*Id*. at pp. 751-752.) However, between the advisement and the waiver, the minor "was not asked if he understood the constitutional rights which he had just heard." (*Id*. at p. 752.) Our colleagues at the Second Appellate District concluded the failure to so inquire did not require the exclusion of the minor's statement. (*Id*. at pp. 755-757.) The court first explained that although minors "are provided a mantle of protection in our society because of their inability to make insightful, mature decisions," this did not mean that they lacked capacity to waive their *Miranda* rights in a knowing and intelligent manner. (*Id*. at p. 756.) Assessing the totality of the circumstances, the court explained that the following circumstances supported the trial court's denial of the motion: (1) the minor was 17 years old; (2) he was properly advised of his *Miranda* rights; (3) prior to the waiver, there was "no incommunicado incarceration, . . . no 'third degree' atmosphere prevailed, . . . [he] was not exposed to threat or cajolery, . . . there was no lengthy interrogation"; and (4) the record did not "suggest that the [minor] was taken unfair or unlawful advantage of due to his ignorance, lack of intelligence, mental condition or vulnerability to persuasion." (*Id*. at p. 757.)

Here, as in *Eduardo G.*, defendant was properly advised of his *Miranda* rights and was not asked whether he understood them. However, contrary to defendant's argument on appeal, this circumstance alone does not dictate the result. We have already dispelled the notion that defendant did not understand the questions posed by Detective Lamb. He clearly did. And far from possessing low intelligence, the record supports the trial court's observation that defendant "attended school until the eleventh grade, that he came to the United States from Moldova, that he received his GED, that he attended some courses in college at [Sacramento City College], that he received some sort of certificate degree in mechanical engineering and worked on planes at Mather Air Force Base." These

25

observations support a conclusion that defendant was more sophisticated than the minor in *Eduardo G.* We also note that the record supports the trial court's observation that defendant was "not a stranger to the criminal justice system," although we do not know whether defendant had his *Miranda* rights read to him in connection with a prior case.

We acknowledge, as did the trial court, that defendant "does have some mental health issues." However, for reasons already expressed, our review of both the transcript *and the audio* of the interview supports the trial court's conclusion that these issues did not prevent defendant from understanding the detective or providing coherent answers to her specific questions regarding the abuse.[8]

We further agree with the trial court's assessment that Detective Lamb never sought to take advantage of defendant's mental problems during the interview. As mentioned, trial counsel disclaimed any argument that the detective engaged in coercion or unduly influenced defendant's statement. One concrete example of Detective Lamb's efforts to make sure defendant understood what he was admitting to, as well as defendant's ability to engage in conversation knowingly and intelligently, occurred when the detective asked a "silly" but "serious question," specifically what defendant understood vaginal sex, anal sex, and oral copulation to mean. When she asked him whether he agreed that oral copulation meant "when a male or female places their mouth, um, over a penis," defendant agreed and added: "Well oral copulation could mean when a man is playing with his mouth with a woman's vagina too." The trial court observed: "That is a certain level of in my view intellectual reasoning that shows me that there is a

---

[8]    We also note the trial court's observations regarding the jail psychiatric records are supported by the record. Two reports from February 13 and February 15, 2018, about two weeks before defendant's interview with Detective Lamb, indicate defendant was oriented to person, place, date, situation, and his thought processes were intact and coherent. However, we consider defendant's performance during the interview itself to be a better indicator of his ability to understand and knowingly waive his *Miranda* rights.

clear indication that he is knowingly and intelligently engaging in a conversation with these officers notwithstanding what appears to be his mental health issues." We agree with this assessment.

Finally, we note that defendant had already confessed to V.S. at the time of the interrogation, demonstrating that he was comfortable discussing his conduct towards his children.

The record supports the trial court's determination that defendant knowingly waived his *Miranda* rights.

IV

*Failure to Object to the Pretext Jail Conversation*

Defendant's second assertion of ineffective assistance of counsel also fails. As previously mentioned, Detective Lamb facilitated a pretext conversation between V.S. and defendant at the jail. While the conversation was in-person, a glass panel separated defendant and V.S., with communication occurring through telephones on each side of the glass. At the start of the call, defendant was informed that the conversation would be recorded. We have already set forth the relevant contents of the conversation and decline to repeat them here.

Defendant did not object to the admission of this conversation below, forfeiting a direct challenge to its admission in this appeal. (See *People v. Quiroz* (2013) 215 Cal.App.4th 65, 78.) Implicitly acknowledging this fact, defendant contends his trial counsel provided constitutionally deficient assistance by failing to object on the ground that defendant's statements in the conversation were involuntarily obtained by an agent of the police. Not so.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.]

27

Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*Ibid.*) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833, disapproved on another point in *Shalabi v. City of Fontana* (2021) 11 Cal.5th 842, 854-855, fn. 5; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) Defendant has not carried his burden of demonstrating deficient performance.

Had counsel objected to the pretext conversation on involuntariness grounds, the prosecution would have been required to establish by a preponderance of the evidence that defendant's statements in the conversation were voluntary and not obtained as a result of police coercion. (*People v. Massie* (1998) 19 Cal.4th 550, 576 (*Massie*); *People v. Maury* (2003) 30 Cal.4th 342, 404 (*Maury*) ["finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions"].) "Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. [Citations.] Among the factors to be considered are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' [Citation.] . . . In determining whether a confession was voluntary,

28

'[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*Massie,* at p. 576.) "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." (*Maury,* at p. 404.)

Assuming, without deciding, that V.S. was acting as an agent of the police when she spoke to defendant at the jail, a matter subject to considerable doubt (see *People v. Martin* (2002) 98 Cal.App.4th 408, 419-420 [providing witness with equipment to record a conversation with the defendant did not make the witness an agent of the police for purposes of determining whether his right to counsel was violated]), the totality of the circumstances surrounding the conversation does not reveal any coercive conduct at all. Indeed, defendant does not claim that V.S. threatened him, engaged in any violence, or promised him anything of value in exchange for his confession. His argument on appeal is limited to what he calls "emotional pressure" from V.S., for example, asking defendant whether he wanted to get help in order to be a family again, telling him that N.S. was having dreams about him apologizing to her but she did not believe him, and asking defendant whether he felt any remorse for raping his daughter. Defendant cites no authority supporting the suggestion that such statements rise to the level of coercion. Nor have we found any on our own. Defendant further argues that "[V.S.] and the detective took advantage of [defendant's] mental illness." However, as with his police interview, our review of the pretext conversation reveals that defendant was able to intelligently engage in conversation with his wife notwithstanding his mental health issues.

We conclude any objection to the admission of the pretext conversation on grounds that defendant's statements were involuntarily obtained as the result of coercive police conduct would have failed. Counsel is not ineffective for failing to bring a meritless challenge to admissible evidence. (*People v. Hart* (1999) 20 Cal.4th 546, 629.)

## V

### *Unanimity Instruction*

Defendant also claims the trial court prejudicially erred and violated his federal constitutional rights by omitting "critical wording" from CALCRIM No. 3501 regarding the requirement of unanimity. Defendant did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 . . . ." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) We conclude there was no miscarriage of justice. The claim is therefore forfeited.

The jury was instructed: "The defendant is charged with numerous acts of child molestation against [N.S.] and one count of child molestation against [C.S.] [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless: [o]ne, you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed; or [two,] you all agree that the People have proved that the defendant committed all the acts alleged to have occurred."

Defendant argues: "The first option should have included the following italicized language: 'You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed *for each offense*.' (CALCRIM No. 3501, brackets omitted.) Without the italicized words, the court's instruction allowed the jurors to bypass the requirement that they unanimously agree on which act [defendant] committed for each count, and instead only agree that he committed at least one of the alleged acts."

While we agree with defendant that the challenged instruction should have included "for each offense," we are not persuaded that the jury would have read the entire charge in the manner he asserts on appeal. "The correctness of jury instructions is

30

determined from the entire charge by the trial court and not from consideration of part or parts of an instruction. [Citation.] We assume the jurors are intelligent persons capable of understanding and correlating all jury instructions given them." (*People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 649.) "[T]he question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts." (*People v. Kelly* (1992) 1 Cal.4th 495, 525.)

Here, the challenged instruction began by referring to multiple counts and then informed the jury that the prosecution "presented evidence of more than one act to prove that the defendant committed *these offenses*." (Italics added.) The jury was then informed unanimity with respect to which act he committed was required. The omitted "for each offense" language would have made it crystal clear that unanimity is required for each offense. But even without that language, a reasonable jury would have read the instruction to require unanimity for "these offenses," i.e., each of the multiple offenses referred to at the start of the instruction. Moreover, we must read the challenged instruction together with CALCRIM No. 3515, which followed immediately after CALCRIM No. 3501. That instruction informed the jury: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." Read together, we conclude the jury was likely to have interpreted CALCRIM No. 3501 correctly, and not, as defendant suggests, to allow it to convict him of multiple molestation counts based on only one act of molestation.

Defendant's instructional error claim is forfeited and, in any event, also fails.

VI

*Cumulative Prejudice*

Having identified no errors, prejudicial or otherwise, defendant's assertion of cumulative prejudice also fails.

31

## VII

### *Sentencing Error*

Finally, defendant asserts five claims of sentencing error. We need to address only two. As we explain *post*, we reject defendant's assertion that he is eligible for only one multiple-victim "sentence enhancement." The multiple-victim allegation, found true by the jury, is not an enhancement, but rather qualified defendant for sentencing under the One Strike law. However, as the Attorney General properly concedes, the trial court does not appear to have understood that it had the discretion to sentence defendant to concurrent as opposed to consecutive terms of imprisonment under the One Strike law. This requires remand for a new sentencing hearing.[9]

---

[9]    This conclusion makes it unnecessary to address whether or not the sentence originally imposed amounted to cruel and/or unusual punishment in violation of the federal or California Constitutions. Defendant acknowledges as much with respect to his as-applied challenge to the constitutionality of his sentence, but argues we should nevertheless address his facial challenge to the One Strike law. In that regard, we simply note that a mandatory life sentence for specified sex crimes committed against vulnerable members of society under aggravating circumstances is not "excessive in any case," as defendant argues on appeal. Indeed, a multitude of appellate decisions has upheld the constitutionality of such sentences in a variety of circumstances. (See, e.g., *People v. Reyes* (2016) 246 Cal.App.4th 62, 85; *People v. Crooks* (1997) 55 Cal.App.4th 797, 805-809.) Defendant may, however, raise his as-applied challenge to whatever sentence the trial court imposes on remand. We also decline to address whether or not the trial court violated the Sixth and Fourteenth Amendments by imposing consecutive terms for the crimes committed against N.S. because the necessary factual finding was made by the judge rather than a jury. A similar issue is currently pending before our Supreme Court. (See *People v. Catarino*, review granted Jan. 19, 2022, S271828.) Defendant may also raise this issue before the trial court during the new sentencing hearing. Finally, defendant argues he is entitled to retroactive application of Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441). On remand, defendant may assert his entitlement to the benefit of this change in the law. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 351.) We express no opinion on the matter.

A. *One-Strike Sentencing*

"Approximately six months after the Legislature enacted the 'Three Strikes' law as urgency legislation, it adopted section 667.61, the One Strike law. [Citations.] This section sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes . . . ." (*People v. Mancebo* (2002) 27 Cal.4th 735, 741 (*Mancebo*).) As relevant here, "[a] person who is convicted of [one of the enumerated offenses] under one of the circumstances specified in subdivision (e), [including the circumstance that such an offense was committed in the present case against more than one victim,] upon a victim who is a child under 14 years of age, shall be punished by imprisonment in the state prison for 25 years to life." (§ 667.61, subd. (j)(2); see also § 667.61, subd. (e)(4).) Section 667.61, subdivision (*o*) "requires the facts of any specified circumstance to be pled and proved to the trier of fact or admitted by the defendant in open court" and "[s]ubdivision (f) provides that if only the minimum number of qualifying circumstances required for One Strike sentencing treatment have been pled and proved, they must be used as the basis for imposing the One Strike term rather than to impose lesser enhancements or punishment under any other law." (*Mancebo,* at p. 742 [summarizing subdivision (f) and former subdivision (i), now subdivision (*o*)].)

Defendant argues "the prosecution pled the multiple-victim enhancement only after Count 18, creating a reasonable inference that it was only seeking one 25-to-life enhancement," as opposed to multiple enhanced terms of 25-to-life for each conviction subject to the One Strike sentencing scheme. In support of this argument, defendant first relies on *Mancebo, supra*, 27 Cal.4th 735, in which our Supreme Court held two gun-use enhancements had to be stricken where gun use was one of two special circumstances pled and proved to qualify the defendant for sentencing under the One Strike law. (*Id.* at pp. 743-745.) In so holding, the court rejected the argument that the error was harmless because the trial court could have substituted the properly pled and proved gun-use circumstance for an unpled multiple-victim circumstance because the defendant was

33

convicted of enumerated offenses against more than one victim. (*Id*. at pp. 741, 743.) Relying on the plain meaning of section 667.61, specifically the subdivisions summarized above, the court explained that because the properly pled and proved gun-use circumstance was required to impose the One Strike sentence, it was not available to support the gun-use enhancements. And because a multiple-victim circumstance was not pled in the case, it was not available to be substituted for the gun-use circumstance, even though there was no dispute that it would have applied had it been properly pled. (*Mancebo* at pp. 744-745.)

Here, there is no dispute that the multiple-victim circumstance was pled and proved. At the end of the amended information, the prosecution "further alleged that the defendant . . . has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim, within the meaning of Penal Code Section 667.61(e)(4) and 667.61(j)(2)."

In support of the argument that the prosecution was required to plead the circumstance with respect to each count, as opposed to at the end of the charging document, defendant relies on *People v. Anderson* (2020) 9 Cal.5th 946 (*Anderson*). There, "the court held that an information alleging a 25-year-to-life vicarious firearm enhancement under section 12022.53, subdivision (e) as to a single murder count did not provide adequate notice that the prosecution would seek the same enhancement on five robbery counts as to which the enhancement was not pleaded." (*People v. Laanui* (2021) 59 Cal.App.5th 803, 816 (*Laanui*), citing *Anderson,* at p. 950.) The *Anderson* court explained: "A pleading that alleges an enhancement as to one count does not provide fair notice that the same enhancement might be imposed as to a different count. When a pleading alleges an enhancement in connection with one count but not another, the defendant is ordinarily entitled to assume the prosecution made a discretionary choice not to pursue the enhancement on the second count, and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial." (*Anderson*, at p. 956.)

34

In *Laanui, supra*, 59 Cal.App.5th 803, our colleagues at the Second Appellate District concluded the *Anderson* court's concerns about fair notice to a defendant were not present in the context of a prior strike allegation under the Three Strikes law (§ 667). That court held "[p]leading and proof of a prior strike allegation is sufficient to subject a defendant to Three Strikes sentencing on all eligible offenses, without alleging the strike on a count-by-count basis." (*Id*. at pp. 817-818.)

We reach the same conclusion with respect to the multiple-victim allegation pled and proved under the One Strike law in this case. Unlike the sentence enhancements at issue in *Anderson*, our Supreme Court has made clear that "the One Strike law is not . . . a sentence enhancement. 'A sentence enhancement is "an *additional term* of imprisonment added to the base term." [Citation.]' [Citation.] The 25-year minimum term of the One Strike law 'does not fall within [this] definition of an enhancement, because it is not an "additional term of imprisonment," and it is not added to a "base term." ' [Citation.] Rather, it 'sets forth an *alternate* penalty for the underlying felony itself, when the jury has determined that the defendant has satisfied the [statute's] conditions . . . .' [Citation.] Thus, the One Strike law does not establish an enhancement, but 'sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes' when a defendant commits one of those crimes under specified circumstances. [Citations.]" (*People v. Acosta* (2002) 29 Cal.4th 105, 118-119.)

Here, in compliance with section 667.61, subdivision (*o*), the prosecution pled and proved the multiple-victim special circumstance qualifying defendant for sentencing under the One Strike law. No more was required.

B. *Remand is Required for an Exercise of Discretion*

Finally, defendant argues the trial court "failed to recognize its discretion to sentence the sexual intercourse convictions . . . and the lewd acts convictions that weren't stayed . . . concurrently instead of consecutively." The Attorney General concedes the

35

point with respect to the lewd conduct convictions.[10] We accept the concession and will therefore vacate defendant's sentence and remand the matter for a new sentencing hearing.

Section 667.61, subdivision (i) provides: "For any offense specified in paragraphs (1) to (7), inclusive, of subdivision (c), or in paragraphs (1) to (6), inclusive, of subdivision (n), the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6." These offenses are: "(1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261. [¶] (2) Rape, in violation of paragraph (1) or (4) of subdivision (a) of former Section 262. [¶] (3) Rape or sexual penetration, in concert, in violation of Section 264.1. [¶] (4) Lewd or lascivious act, in violation of subdivision (b) of Section 288. [¶] (5) Sexual penetration, in violation of subdivision (a) of Section 289. [¶] (6) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 286. [¶] (7) Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 287 or former Section 288a." (§ 667.61, subd. (c); see also § 667.61, subd. (n)(1)-(6).) Defendant was not convicted of any of these offenses.

The probation report recommended consecutive sentences for defendant's crimes based on the factors set forth in California Rules of Court, rule 4.425, without mentioning section 667.61, subdivision (i). At the sentencing hearing, the prosecution argued for

---

**10** With respect to defendant's sexual intercourse convictions, the Attorney General notes that defendant was sentenced to terms of 25 years to life, not because of the One Strike law, but because section 288.7, subdivision (a) requires that term of imprisonment be imposed. While true, this provision does not require the trial court to impose consecutive terms of imprisonment. For reasons to be explained *post*, the trial court did not distinguish between these convictions and the other convictions when imposing consecutive sentences in this case. Instead, it appeared to believe the One Strike law required consecutive sentences for all.

36

consecutive sentences while impliedly acknowledging concurrent sentences were a possibility if the trial court were inclined to grant defendant some leniency. However, defense counsel stated: "What [the prosecution] is saying regarding a recommendation and concurrent time, in my reading of the law, I don't think the Court has any–even if the Court wanted to exercise discretion, I don't think the Court can." The trial court agreed stating, "[t]he only way this could be concurrent would be if I were to find that one or more of these offenses that occurred against [N.S.] were perpetrated on the same day, but I'm not making that finding." After explaining that the crimes committed against N.S. were alleged and proved to have been committed on separate occasions, the trial court concluded, "it would be an error for me not to impose consecutive sentencing, and I don't think you would have an argument to do otherwise."

Then, before imposing defendant's sentence, the trial court stated: "So I am going to absolutely follow the Probation Department's recommendations. Actually, it's what the law requires[.]" The court then imposed consecutive sentences on all counts that were not stayed pursuant to section 654. Regarding the reason for imposing consecutive sentences, the court stated: "I incorporate by reference my earlier colloquy between myself and [defense counsel] with respect to why I am imposing consecutively in this case."

Because defendant was not convicted of any of the crimes specified in section 667.61, subdivision (i), consecutive sentencing was discretionary, not mandatory. (*People v. Lopez* (2022) 76 Cal.App.5th 287, 291.) However, as the Attorney General concedes, the trial court "appeared to believe that consecutive sentences were mandated by [this provision]." " 'It is axiomatic that when an issue entrusted to the trial court's discretion is properly presented to the court for decision, the court must *exercise* its discretion: In such a case a statement or other evidence that the court believes it has no discretion, but must rule in a certain way, indicates an error so fundamental as to be said to amount to a refusal to exercise jurisdiction.' [Citation.]" (*People v. Bolian* (2014) 231

37

Cal.App.4th 1415, 1421.) "Because the trial court may not have recognized it had discretion to impose concurrent or consecutive sentences on [defendant's] convictions . . . remand is appropriate to allow the trial court to exercise that discretion. On remand, the court must state its reasons for imposing either concurrent or consecutive sentences." (*Lopez*, at p. 294; see Cal. Rules of Court, rule 4.406(b).)

DISPOSITION

The sentence is vacated, and the matter remanded to the trial court for a new sentencing hearing, during which the trial court shall: (1) exercise its discretion in imposing either consecutive or concurrent terms of imprisonment, stating reasons for that sentencing choice; and (2) prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.



\s\
McADAM, J.*

We concur:

\s\
HULL, Acting P. J.

\s\
RENNER, J.

---

\*      Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.